RON BENDER (SBN 143364)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbyb.com; kjm@lnbyb.com

Proposed Counsel for Chapter 11 Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>GAMMA MEDICA-IDEAS (USA), INC.,<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>GAMMA MEDICA-IDEAS, INC.,<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>ADVANCED MOLECULAR IMAGING LLC,<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>ADVANCED MOLECULAR IMAGING, INC.,<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>INDUSTRIAL DIGITAL IMAGING, INC.,<br>_____<br>☒  Affects All Debtors | Lead Case No.: 1:12-bk-17469-VK<br><br>Jointly administered with:<br><br>1:12-bk-17474-VK<br>(Gamma Medica-Ideas, Inc.);<br><br> 1:12-bk-17475-VK<br>(Advanced Molecular Imaging LLC);<br><br> 1:12-bk-17479-VK<br>(Advanced Molecular Imaging, Inc.); and<br><br> 1:12-bk-17483-VK<br>(Industrial Digital Imaging, Inc.)<br><br>Chapter 11 Cases<br><br>**NOTICE OF HEARING ON APPLICATION AND APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO EMPLOY CRS CAPSTONE PARTNERS LLC AS INVESTMENT BANKER PURSUANT TO 11 U.S.C. § 328; DECLARATION OF BRIAN L. DAVIES JR., CIRA IN SUPPORT THEREOF**<br><br>**[Hearing Schedule Set Forth Below]** |

☐ Affects Gamma Medica-Ideas (USA), Inc., only

☐ Affects Gamma Medica-Ideas, Inc., only

☐ Affects Advanced Molecular Imaging  LLC, only

☐ Affects Advanced Molecular Imaging, Inc., only

☐ Affects Industrial Digital Imaging, Inc., only

**Hearing:**
**Date:  October 2, 2012**
**Time:  2:30 p.m.**
**Place:  Courtroom 301**
    **21041 Burbank Blvd.**
    **Woodland Hills, CA 91367**

# TABLE OF CONTENTS

**Notice of Hearing**..............................................................................................**3**

**Application** ........................................................................................................**5**

    **A.**    **Background** ...................................................................................**5**

    **B.**    **The Debtors' Employment of CRS as the Debtors' Investment Banker**.....**9**

    **C.**    **Proposed Compensation Structure** .................................................**11**

**Declaration of Brian L. Davies Jr., CIRA** ...........................................................**15**

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL STATUTES**

11 U.S.C. § 328 ....................................................................................................3, 5, 12

11 U.S.C. § 328(a) ...................................................................................................... 13

11 U.S.C. § 330 ..........................................................................................................13

**FEDERAL RULES**

Fed.R.Bankr.P. 2014 .....................................................................................................3

Fed.R.Bankr.P. 2014-1 ..................................................................................................3

Fed.R.Bankr.P. 9013-1 (f) ............................................................................................3

Fed.R.Bankr.P. 6003 .....................................................................................................3

**PLEASE TAKE NOTICE THAT** on October 2, 2012, at 2:30 p.m., the Court will hold a hearing in Courtroom "301" located at 21041 Burbank Blvd, Woodland Hills, California 91367, on the application (the "Application") filed by Advanced Molecular Imaging LLC ("AMI LLC"), Industrial Digital Imaging, Inc. ("IDI"), Advanced Molecular Imaging, Inc. ("AMI Inc."), Gamma Medica-Ideas, Inc. ("Gamma Holdco") and Gamma Medica-Ideas (USA), Inc. ("Gamma USA"), Chapter 11 debtors and debtors in possession in the above-entitled jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), for Court approval of their employment of CRS Capstone Partners LLC ("CRS") as the Debtors' investment banker pursuant to 11 U.S.C. § 328, and upon the terms and conditions described below, with the Debtors' employment of CRS to be effective as of September 2, 2012.

**PLEASE TAKE FURTHER NOTICE** that the Application is based upon 11 U.S.C. § 328, Rule 2014 and Rule 6003 of the Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rule 2014-1, the Application, this Notice, the Declaration of Brian L. Davies Jr., CIRA (the "Davies Declaration"), the Transaction Engagement Agreement (the "Agreement") attached as Exhibit "1" to the Davies Declaration, the arguments and statements of counsel to be made at the hearing on the Application, and other admissible evidence properly brought before the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1 (f), any opposition to the Application must be filed with the Clerk of the United States Bankruptcy Court and served upon the United States Trustee as well as counsel for the Debtors at the address located in the upper left-hand corner of the first page of this Notice and Application by no later than 14 days before the hearing on the Application.

**PLEASE TAKE FURTHER NOTICE** that the failure to file and serve a timely response to the Application may be deemed by the Court to be consent to the granting of the relief requested in the Application.

/ / /

/ / /

/ / /

/ / /

3

**WHEREFORE**, the Debtors respectfully request that the Court approve the Debtors' employment of CRS as the Debtors' investment banker upon the terms and conditions set forth herein.

Dated: September 6, 2012

GAMMA MEDICA-IDEAS (USA), INC., et al.

By:  ___/s/ Ron Bender_____
RON BENDER
KRIKOR J. MESHEFEJIAN
LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.
Proposed Counsel for Chapter 11 Debtors
and Debtors in Possession

## APPLICATION

Advanced Molecular Imaging LLC ("AMI LLC"), Industrial Digital Imaging, Inc. ("IDI"), Advanced Molecular Imaging, Inc. ("AMI Inc."), Gamma Medica-Ideas, Inc. ("Gamma Holdco") and Gamma Medica-Ideas (USA), Inc. ("Gamma USA"),  Chapter 11 debtors and debtors in possession in the above-entitled jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), hereby submit this application (the "Application") for Court approval of their employment of CRS Capstone Partners LLC ("CRS") as the Debtors' investment banker pursuant to 11 U.S.C. § 328, and upon the terms and conditions described below, with the Debtors' employment of CRS to be effective as of September 2, 2012.  In support of this Application, the Debtors respectfully represent as follows:

**A.    Background.**

1.    The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on August 20, 2012 (the "Petition Date").  The Debtors continue to operate their business, manage their financial affairs and operate their bankruptcy estates as debtors in possession.

2.    The Debtors' corporate structure is as follows:  AMI LLC is the sole shareholder of IDI, AMI Inc., and Gamma Holdco.  AMI LLC has no assets other than the shares of stock that it owns in IDI, AMI Inc. and Gamma Holdco.  IDI and AMI Inc. do not have any assets or operations but are subject to guarantee debt related to liabilities of the other Debtors.

3.    Gamma Holdco is the sole shareholder of Gamma USA.  Gamma Holdco also wholly owns Gamma Medica-Ideas (Canada), Inc. ("Gamma Canada") and Gamma Medica-Ideas Norway AS ("Gamma Norway").  Gamma Canada and Gamma Norway are foreign entities that have not filed for bankruptcy protection in the United States.  Gamma USA is the primary domestic operating entity.

4.    Headquartered in Northridge, California, the Debtors are leading providers of next-generation pre-clinical and clinical imaging systems based on novel technologies to improve patient health through early diagnosis of disease, through early patient treatment, and by enabling

1    new drug discovery.  The Debtors' operate through three divisions – preclinical, clinical, and

2    industrial (based in Norway).

3        5.    The Debtors' pre-clinical imaging platform consists of the world's first and only

4    complete range of digital imaging technologies.  In drug development, researchers must evaluate

5    toxicity and side effects while they validate the effects of the drug on the biological system.  To

6    do this, researchers perform pre-clinical tests.  Traditionally, researchers who conducted

7    biological tests only had available to them *ex vivo* techniques, some of which involved sacrificing

8    large numbers of animals.  Until recently, *in vivo* techniques, i.e., non-invasive techniques, were

9    unavailable.  The Debtors' pre-clinical *in vivo* imaging platform enables pharmaceutical

10   companies to reduce costs and standardize analytical techniques across key areas of the drug

11   development/discovery chain.  The Debtors generate revenue from the sales and service of their

12   pre-clinical imaging systems.  The Debtors believe that by implementing further planned cost

13   reductions, they can ultimately get their pre-clinical imaging division's cash flow to break even.

14       6.    The Debtors' clinical imaging division, launched in 2010, consists of the first

15   commercially available, FDA approved fully solid-state digital detection molecular breast

16   imaging system, called LumaGEM™.  LumaGEM is currently indicated for the secondary

17   diagnosis of breast cancer.  The Debtors' clinical imaging division is a "start-up" enterprise

18   requiring significant investment to cover major expenditures, with little current revenue.

19       7.    The Debtors' industrial division develops radiation detector systems and creates

20   highly integrated detector readout data acquisition systems, which are used in satellite space

21   missions and in commercial products.  Gamma Norway, which has not filed for bankruptcy (in

22   the United States or otherwise), is the company that operates the Debtors' industrial division.

23       8.    <u>Senior Secured Debt</u>:  Gamma Holdco, Gamma USA, IDI, and AMI Inc. are

24   borrowers on a senior secured revolver loan provided by Bridge Bank, National Association, in

25   the total outstanding amount of approximately $3,010,979 (the "<u>Bridge Bank Loan</u>").  AMI LLC

26   and Gamma Canada have guaranteed the Bridge Bank Loan.  The Bridge Bank Loan is secured

27   by essentially all of the Debtors' assets.  Shortly prior to the Petition Date, the Bridge Bank Loan

28   was sold to Capital Resource Partners V, L.P. ("<u>CRP</u>"), which is a holder of senior subordinated

secured debt and will be serving as the Debtors' "DIP Lender" (as more described below).  Bridge Bank has filed UCC-1 financing statements against the Debtors asserting claims against all of their personal property, including the Debtors' cash collateral.

9.    <u>Senior Subordinated Secured Debt</u>:  Gamma Holdco, Gamma USA, IDI and AMI Inc. are borrowers on various traunches of subordinated secured debt provided by CRP, Steven Lee ("<u>Lee</u>"), and affiliates of Psilos Group Managers ("<u>Psilos</u>"), in the total outstanding sum of approximately $8,918.399 (the "<u>Subordinated Debt</u>").    Approximately $7,703.713 of the Subordinated Debt is owed to CRP, approximately $94,076 of the Subordinated Debt is owed to Lee, and approximately $1,120,610 of the Subordinated Debt is owed to Psilos.    The Subordinated Debt is secured by essentially all of the Debtors' assets.  CRP has filed UCC-1 financing statements against the Debtors asserting claims against all of their personal property, including the Debtors' cash collateral.  While neither Lee nor Psilos filed UCC-1 financing statements, it is the Debtors' understanding that as participants in the Subordinated Debt, their respective portion of the Subordinated Debt is secured by the CRP UCC-1 financing statements.

10.    <u>Judgment Lien</u>:  Technical Imaging Solutions, LLC asserts a judgment lien against Gamma USA, securing a judgment against Gamma USA in the approximate amount of $204,585, and purportedly secured by all of Gamma USA's assets, including its cash collateral.

11.    <u>Unsecured Debt</u>:  In addition to the foregoing secured debt, the Debtors have approximately $12.6 million of unsecured debt, the majority of which is owed to SII NanoTechnology USA Inc. ("<u>SIINT</u>").

12.    It became clear to the Debtors during the early part of 2012 that unless the Debtors could consummate a going concern sale of their pre-clinical and/or clinical divisions or obtain additional financing, the Debtors would be unable to continue with their business operations and would have to shut down and liquidate.  During the earlier part of 2012, the Debtors embarked upon a comprehensive effort to effectuate a sale of their business/assets for the benefit of their creditors.  The Debtors employed Houlihan Lokey to serve as the Debtors' investment bankers in this sales process.  Houlihan Lokey's preliminary sale price indication provided to the Debtors indicated that Houlihan Lokey expected to be able to sell the Debtors' business/assets for more

1    than the entirety of the Debtors' debt, which led the Debtors to believe that they would be in a

2    position to pay all of their creditors in full upon the sale closing.  Houlihan Lokey's marketing

3    process, however, did not yield any bids sufficient to pay creditors in full.    The rationale or

4    reason for the process's lack of success is unclear.    It may be attributable to timing,

5    macroeconmic considerations, the circumstances of the process itself, or some other reason or

6    combination of reasons.

7        13.    The Debtors have been undercapitalized for a while and been unable to satisfy

8    their debts as they came due, and the Debtors were hoping and expecting to resolve their liquidity

9    problems from the Houlihan Lokey sale efforts.  The Debtors do not generate sufficient revenue

10   to enable the Debtors to pay their operating expenses – let alone satisfy their substantial existing

11   debt, which is summarized above.  As the Debtors were rapidly running out of cash, it became

12   clear that without an immediate funding commitment, the Debtors were a matter of days (or

13   possibly weeks) away from completely running out of money and having to shut their doors and

14   liquidate.  As a result, without a new funding commitment, the Debtors had intended to file

15   Chapter 7 bankruptcy cases, which presumably would have resulted in a liquidation of the

16   Debtors' assets with a nominal recovery for the Debtors' secured creditors and no recovery for

17   any other creditors.

18       14.    CRP agreed to provide the Debtors' with up to $1.5 million of post-petition

19   financing on a senior secured basis subject to the post-petition financing being approved by the

20   Court.  The CRP financing is the only funding which has been made available to the Debtors and

21   therefore the only option available to enable the Debtors to avoid an immediate shut down and

22   liquidation of their business/assets.  The CRP financing is expected to provide the Debtors with

23   approximately four months to consummate a sale of their business/assets or to confirm a plan of

24   reorganization.  The Court approved the CRP post-petition financing on an emergency interim

25   basis at a hearing held on August 23, 2012.  A final hearing with respect to the CRP post-petition

26   financing is scheduled to be held on September 6, 2012.

27       15.    One of the requirements of the CRP post-petition financing is that on or before the

28   date of the final hearing (i.e., September 6, 2012), the Debtors are required to file an application

with the Court to employ an investment banker which is reasonably acceptable to CRP.  Since the Petition Date, the Debtors have been engaged in an extensive search to employ the optimal investment banker for these cases.  During that process, the Debtors interviewed a total of seven prospective investment bankers.  While a number of the investment bankers the Debtors interviewed and/or consulted with were well qualified for this assignment, the Debtors concluded that CRS is the best choice to serve as the Debtors' investment banker.

16.    While the Debtors are required to employ an investment banker immediately pursuant to the terms of their post-petition financing agreement with CRP, the Debtors would unquestionably have employed an investment banker immediately in any event because in order for the Debtors to avoid a shut down and liquidation of their business/assets, the Debtors must be able to consummate a sale of their business/assets or confirm a plan of reorganization involving a restructuring of their debt and/or equity before the Debtors fully exhaust their post-petition financing from CRP.  As indicated above, the Debtors believe that the $1.5 million of post-petition financing from CRP is expected to provide the Debtors with approximately four months to consummate a sale of their business/assets or confirm a plan of reorganization.

17.    The Debtors expect that a creditors' committee will be formed in these cases, and the Debtors expect to work closely with CRP and the creditors' committee to maximize the value of these estates and the recovery for creditors.  The Debtors believe that a new post-petition sale process with a different investment banker may result in a different outcome than the pre-petition Houlihan Lokey sale process in light of the distressed nature of this sale process.  The additional four months of operating existence made possible by the CRP post-petition financing will also provide the Debtors and the creditors' committee, with the assistance of CRS, an opportunity to see if a debt restructuring is feasible and beneficial pursuant to a confirmed plan of reorganization.

**B.    The Debtors' Employment of CRS as the Debtors' Investment Banker.**

18.    For all of the reasons described above, the Debtors require the immediate services of a qualified investment banker to assist the Debtors to market their business/assets for sale or investment.

19.    The Debtors seek to employ CRS as their investment banker for this purpose, pursuant to the terms of the Transaction Engagement Agreement (the "Agreement") attached as Exhibit "1" to the annexed Declaration of Brian L. Davies Jr., CIRA, the Managing Director of CRS,  (the "Davies Declaration").[1]  CRS is an investment bank and financial advisor which specializes in assisting middle market companies to find buyers, investors, debt and equity capital.  CRS' professionals have a vast amount of experience as investment bankers and financial advisors assisting Chapter 11 debtors for these purposes, including in the cases of Lon Morris College; Sawyer Enterprises (The W Boston Hotel); Western Massachusetts Lifecare Corporation; Payton Construction; Enesco Corporate; Kmart; Delta Airlines; United Airlines; and Fas Mart.  CRS also has extensive experience serving as investment bankers and financial advisors to health care related companies, including Radius Medical Technologies, Inc.; Keraderm; Nova Science; Emerson; AngioLink; Clinical Innovations; and Binax.  CRS will leverage its health and medical network and a use its best efforts in:

- preparing presentation materials for use in the Transaction process;
- identifying and evaluating a refined targeted list of potential acquirers;
- initiating contact and arranging introductions with Prospective Acquirers;
- conducting telephonic or in-person meetings;
- advising the Company with coordinating the receipt and comparison of any offers or proposals forthcoming from Prospective Acquirers;
- analyzing proposed valuations, transaction structures and related terms and conditions; and
- negotiating and consummating definitive agreements (including where appropriate, responding to the Company's reasonable requests for assistance in coordinating the due diligence) and closing the Transaction.

20.    CRS' services shall include assisting and advising the Debtors with: (i) formulating a market strategy for a liquidity transaction; (ii) preparing a memorandum and

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to such terms in the Agreement.

presentations for use in the transaction process; (iii) identifying and evaluating a refined targeted list of potential strategic and/or financial acquirers ("Prospective Acquirers"); (iv) initiating contact and arranging introductions with Prospective Acquirers; (v) conducting telephonic or in-person meetings; (vi) coordinating the receipt and comparison of any offers or proposals forthcoming from Prospective Acquirers; (vii) assessing and analyzing proposed valuations, transaction structures and related terms and conditions; and (viii) negotiating and consummating definitive agreements, including where appropriate, responding to the Debtors' reasonable requests for assistance in coordinating the due diligence and transaction closing processes (the "Services").

**C.      Proposed Compensation Structure.**

21.      The Court approved cash collateral budget, which as described above is scheduled for final hearing on September 6, 2012, provides for a post-petition retainer in the amount of $100,000 to be paid to an investment banker during the week ending September 14, 2012, and for a second post-petition retainer in the amount of $10,000 to be to an investment banker during the week ending October 12, 2012.  The Court approved cash collateral budget, if approved on a final basis, will authorize the Debtors to spend up to $110,000 on an investment banker from the Debtors' cash collateral.  As a result, any further payments to be made by the Debtors to an investment banker will have to be done with the consent of the Debtors' secured creditors or order of the Court.  This will presumably be the result of one or more of the following occurrences: (i) the Debtors are able to consummate a sale of some or all of their assets for more than their secured debt, which would therefore provide the Debtors with unencumbered cash out of which the Debtors could pay further sums to CRS; (ii) CRP and the Debtors other secured creditors consent to the Debtors' further use of cash collateral to pay additional sums to CRS or the Court authorizes those payments over the secured creditor(s)' objection; or (iii) the Debtors are able to confirm a plan of reorganization and pay any additional sums owing to CRS as an administrative claim allowed by the Court.

22.      Pursuant to the Agreement, as compensation for Services rendered by CRS, the Debtors agree to pay CRS: a non-refundable retainer of $100,000, a transaction completion fee

payable immediately upon closing, and court approval, equal to either (i) $200,000 if the Aggregate Transaction Value (as defined in Section 4 of exhibit "1") is less than $9.0 million, or; (ii) three and one half percent (3.50%) if the Aggregate Transaction Value is between $9.0 million and $13.0 million, or; (iii) five percent (5.00%) if the Aggregate Transaction Value is over $13.0 million.

23.    CRS acknowledges from time to time it may be required to testify in Bankruptcy Court related to its retention, Services or professional fees. Such time incurred by CRS providing testimony to the Bankruptcy Court related to Services (the "Testimony Services"), but not to its retention or professional fees, shall be billed on an hourly basis consistent with CRS' normal billing rates.  A list of CRS' current billing rates is attached as Exhibit "2" to the Davies Declaration.  In addition, CRS shall be reimbursed by the Debtors for all reasonable expenses related to the Services and Transaction.

24.    CRS has not received any prior payment from the Debtors.  CRS has not received any lien or other interest in property of the Debtors or of any third party to secure payment of any fee

25.    CRS negotiated the terms of its retention, as set forth in this Application, based upon a number of factors including, without limitation, the amount of time that CRS expects to put forth in the Debtors' cases and the limited funds available to pay to CRS pursuant to the terms of the Court approved cash collateral budget.

26.    CRS has not shared or agreed to share its fee with any other person or entity, except among its members.

27.    CRS will not be maintaining time sheets or billing records in connection with its representation of the Debtors since CRS is not billing the Debtors on an hourly basis, except for Testimony Services.  However, CRS will maintain time sheets and billing records in connection with providing Testimony Services.  In addition, since CRS is seeking to be employed pursuant to the provisions of Section 328 of the Bankruptcy Code, CRS is seeking to be excused from the need to file a formal fee application with the Court in connection with the payment of its fees.  If the Court prefers for CRS to do so, CRS is willing to file a formal final fee application after

completing its representation of the Debtors.  All fees paid to CRS will be subject to review only pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in Section 330 of the Bankruptcy Code.  The Debtors submit that these terms are reasonable and appropriate for these cases, particularly given the chances that CRS will not be able to be paid any sums beyond the $110,000 of post-petition retainers described above.

28.    CRS understands the provisions of the Bankruptcy Code which require, among other things, Court approval of the Debtors' employment of CRS and of the fees and expenses that CRS will be paid by the Debtors' estates.

29.    CRS is not a creditor, equity security holder or insider of the Debtors.  CRS does not have any previous or current connection with any insider of the Debtors or any insider of an insider of the Debtors.

30.    As set forth in the annexed Davies Declaration, to the best of CRS' knowledge, CRS does not hold or represent any interest materially adverse to the Debtors or to the Debtors' estates.  Also, other than as indicated in the Davies Declaration, to the best of CRS' knowledge, CRS has no prior connection with the Debtors, any creditors of the Debtors or their estates, or any other party in interest in the Debtors' cases, or any of their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

31.    In the ordinary course of its business, CRS routinely interacts and is involved with a broad network of capital-market participants, including possibly secured creditors in these cases, in matters unrelated to the Debtors' bankruptcy cases.  Neither the Debtors nor CRS believe that such interactions constitute any actual or potential conflict of interests.  CRS will supplement this disclosure and advise the Court if it becomes aware of any potential or actual conflict.

32.    CRS is not and was not an investment banker for any outstanding security of the Debtors.  CRS has not been within three years before the Petition Date an investment banker for a security of the Debtors, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

33.     Neither CRS nor any member of CRS is, nor was, within two years before the Petition Date, a director, officer or employee of the Debtors or of any investment banker for any security of the Debtors.

34.     As set forth in the annexed Davies Declaration, to the best of CRS' knowledge, CRS does not hold or represent any interest materially adverse to the Debtors or their estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors, or for any other reason.

35.     The Debtors believe that their employment of CRS upon the terms and conditions set forth above is necessary and in the best interests of the Debtors' estates.

**WHEREFORE**, the Debtors respectfully request that the Court approve the Debtors' employment of CRS as the Debtors' investment banker upon the terms and conditions set forth above.

Dated: September 6, 2012                    GAMMA MEDICA-IDEAS (USA), INC., et al.


                                            By:    */s/ James Calandra*
                                                    James Calandra, President and Chief
                                                    Executive Officer

Respectfully submitted by:


By:    */s/ Ron Bender*
Ron Bender
Krikor J. Meshefejian
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
Proposed Attorneys for Chapter 11
Debtors and Debtors in Possession

14

## DECLARATION OF BRIAN L. DAVIES JR., CIRA

I, Brian L. Davies Jr., CIRA, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.  Capitalized terms not otherwise defined shall have the same meaning ascribed to such terms in the Application.

2.      I am a Managing Director and Practice Head of CRS Capstone Partners LLC ("CRS"), whose business office is located at 176 Federal Street, 3rd Floor, Boston, MA 02110.

3.      I manage the firm's corporate restructuring practice and handle all specialty M&A and financing transactions.  I have approximately 15 years of professional experience working extensively in the fields of corporate recovery, business reorganization, interim management, mergers & acquisitions, 363 sales and recapitalizations.  I have provided financial advisory services to lenders, debtors, creditors' committees, trustees and equity holders in bankruptcy matters and out-of-court restructurings. I provide assistance to under-performing businesses, potential acquirers of distressed assets / entities, and advised clients on general business issues.

4.      Advanced Molecular Imaging LLC ("AMI LLC"), Industrial Digital Imaging, Inc. ("IDI"), Advanced Molecular Imaging, Inc. ("AMI Inc."), Gamma Medica-Ideas, Inc. ("Gamma Holdco") and Gamma Medica-Ideas (USA), Inc. ("Gamma USA"),   Chapter 11 debtors and debtors in possession in the above-entitled Chapter 11 bankruptcy cases (collectively, the "Debtors"), have requested CRS to serve as the Debtors' investment banker in connection with the Debtors' pending Chapter 11 bankruptcy cases in accordance with the terms of the Application to which this Declaration is attached and the Transaction Engagement Agreement (the "Agreement") attached as Exhibit "1" to this Declaration.

5.      I understand that the Debtors commenced their Chapter 11 bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on August 20, 2012.  I

understand that Jim Calandra is serving as the Debtors' President and Chief Executive Officer.  I

have discussed the Debtors' Chapter 11 cases at length with Mr. Calandra.

6.    I understand that Capital Resource Partners V, L.P. ("CRP") has agreed to provide

the Debtors' with up to $1.5 million of post-petition financing on a senior secured basis subject to

the post-petition financing being approved by the Court.  I further understand that the CRP

financing is the only funding which has been made available to the Debtors and therefore the only

option available to enable the Debtors to avoid an immediate shut down and liquidation of their

business/assets.  I further understand that the CRP financing is expected to provide the Debtors

with approximately four months to consummate a sale of their business/assets or to confirm a plan

of reorganization.

7.    I also understand that a creditors' committee is expected to be formed in these

cases in the very near future and that the Debtors expect to work closely with CRS and the

creditors' committee to maximize the value of these estates and the recovery for creditors.  I also

understand that the Debtors engaged in a pre-bankruptcy sale process using a different investment

banker (Houlihan Lokey) which did not result in a successful sale and that the Debtors believe

that a new post-petition sale process with a different investment banker may result in a different

outcome than the pre-petition Houlihan Lokey sale process in light of the distressed nature of this

sale process.  I further understand that the additional four months of operating existence made

possible by the CRP post-petition financing will also provide the Debtors and the creditors'

committee, with the assistance of CRS, an opportunity to see if a debt restructuring is feasible and

beneficial pursuant to a confirmed plan of reorganization.

8.    I understand that the Court approved cash collateral budget, which is scheduled for

final hearing on September 6, 2012, provides for a post-petition retainer in the amount of $100,000

to be paid to an investment banker during the week ending September 14, 2012, and for a second

post-petition retainer in the amount of $10,000 to be to an investment banker during the week

ending October 12, 2012.  I understand that the Court approved cash collateral budget, if approved

on a final basis, will authorize the Debtors to spend up to $110,000 on an investment banker from

the Debtors' cash collateral.  I therefore understand that any further payments to be made by the

Debtors to CRS will have to be done with the consent of the Debtors' secured creditors or order of

the Court.  This will presumably be the result of one or more of the following occurrences: (i) the

Debtors are able to consummate a sale of some or all of their assets for more than their secured

debt, which would therefore provide the Debtors with unencumbered cash out of which the Debtors

could pay further sums to CRS; (ii) CRP and the Debtors other secured creditors consent to the

Debtors' further use of cash collateral to pay additional sums to CRS or the Court authorizes those

payments over the secured creditor(s)' objection; or (iii) the Debtors are able to confirm a plan of

reorganization and pay any additional sums owing to CRS as an administrative claim allowed by

the Court.

      9.     CRS is an investment bank and financial advisor which specializes in assisting

middle market companies to find buyers, investors, debt and equity capital.  CRS' professionals

have a vast amount of experience as investment bankers and financial advisors assisting Chapter 11

debtors for these purposes, including in the cases of Lon Morris College; Sawyer Enterprises (The

W Boston Hotel); Western Massachusetts Lifecare Corporation; Payton Construction; Enesco

Corporate; Kmart; Delta Airlines; United Airlines; and Fas Mart.  CRS also has extensive

experience serving as investment bankers and financial advisors to health care related companies,

including Radius Medical Technologies, Inc.; Keraderm; Nova Science; Emerson; AngioLink;

Clinical Innovations; and Binax.  CRS will leverage its health and medical network and a use its

best efforts in:

- preparing presentation materials for use in the Transaction process;

- identifying and evaluating a refined targeted list of potential acquirers;

- initiating contact and arranging introductions with Prospective Acquirers;

- conducting telephonic or in-person meetings;

- advising the Company with coordinating the receipt and comparison of any offers or proposals forthcoming from Prospective Acquirers;

- analyzing proposed valuations, transaction structures and related terms and conditions; and

- negotiating and consummating definitive agreements (including where appropriate, responding to the Company's reasonable requests for assistance in coordinating the due diligence) and closing the Transaction.

10.    CRS' services shall include assisting and advising the Debtors with: (i) formulating a market strategy for a liquidity transaction; (ii) preparing a memorandum and presentations for use in the transaction process; (iii) identifying and evaluating a refined targeted list of potential strategic and/or financial acquirers ("Prospective Acquirers"); (iv) initiating contact and arranging introductions with Prospective Acquirers; (v) conducting telephonic or in-person meetings; (vi) coordinating the receipt and comparison of any offers or proposals forthcoming from Prospective Acquirers; (vii) assessing and analyzing proposed valuations, transaction structures and related terms and conditions; and (viii) negotiating and consummating definitive agreements, including where appropriate, responding to the Debtors' reasonable requests for assistance in coordinating the due diligence and transaction closing processes (the "Services").

11.    The Court approved cash collateral budget, which as described above is scheduled for final hearing on September 6, 2012, provides for a post-petition retainer in the amount of $100,000 to be paid to an investment banker during the week ending September 14, 2012, and for a

second post-petition retainer in the amount of $10,000 to be to an investment banker during the week ending October 12, 2012.  The Court approved cash collateral budget, if approved on a final basis, will authorize the Debtors to spend up to $110,000 on an investment banker from the Debtors' cash collateral.  As a result, any further payments to be made by the Debtors to an investment banker will have to be done with the consent of the Debtors' secured creditors or order of the Court.  This will presumably be the result of one or more of the following occurrences: (i) the Debtors are able to consummate a sale of some or all of their assets for more than their secured debt, which would therefore provide the Debtors with unencumbered cash out of which the Debtors could pay further sums to CRS; (ii) CRP and the Debtors other secured creditors consent to the Debtors' further use of cash collateral to pay additional sums to CRS or the Court authorizes those payments over the secured creditor(s)' objection; or (iii) the Debtors are able to confirm a plan of reorganization and pay any additional sums owing to CRS as an administrative claim allowed by the Court.

12.    Pursuant to the Agreement, as compensation for Services rendered by CRS, the Debtors agree to pay CRS: a non-refundable retainer of $100,000, a transaction completion fee payable immediately upon closing, and court approval, equal to either (i) $200,000 if the Aggregate Transaction Value (as defined in Section 4 of exhibit "1") is less than $9.0 million, or; (ii) three and one half percent (3.50%) if the Aggregate Transaction Value is between $9.0 million and $13.0 million, or; (iii) five percent (5.00%) if the Aggregate Transaction Value is over $13.0 million.

13.    CRS acknowledges from time to time it may be required to testify in Bankruptcy Court related to its retention, Services or professional fees. Such time incurred by CRS providing testimony to the Bankruptcy Court related to Services (the "Testimony Services"), but not to its retention or professional fees, shall be billed on an hourly basis consistent with CRS' normal

billing rates.  A list of CRS' current billing rates is attached as Exhibit "2" to this Declaration.  In addition, CRS shall be reimbursed by the Debtors for all reasonable expenses related to the Services and Transaction.

14.    CRS has not received any prior payment from the Debtors.  CRS has not received any lien or other interest in property of the Debtors or of any third party to secure payment of any fee

15.    CRS negotiated the terms of its retention, as set forth in this Application, based upon a number of factors including, without limitation, the amount of time that CRS expects to put forth in the Debtors' cases and the limited funds available to pay to CRS pursuant to the terms of the Court approved cash collateral budget.

16.    CRS has not shared or agreed to share its fee with any other person or entity, except among its members.

17.    CRS will not be maintaining time sheets or billing records in connection with its representation of the Debtors since CRS is not billing the Debtors on an hourly basis, except for Testimony Services.  However, CRS will maintain time sheets and billing records in connection with providing Testimony Services.  In addition, since CRS is seeking to be employed pursuant to the provisions of Section 328 of the Bankruptcy Code, CRS is seeking to be excused from the need to file a formal fee application with the Court in connection with the payment of its fees.  If the Court prefers for CRS to do so, CRS is willing to file a formal final fee application after completing its representation of the Debtors.  All fees paid to CRS will be subject to review only pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in Section 330 of the Bankruptcy Code.  The Debtors submit that these terms are reasonable and appropriate for these cases, particularly given the

chances that CRS will not be able to be paid any sums beyond the $110,000 of post-petition retainers described above.

18.     CRS understands the provisions of the Bankruptcy Code which require, among other things, Court approval of the Debtors' employment of CRS and of the fees and expenses that CRS will be paid by the Debtors' estates.

19.     CRS is not a creditor, equity security holder or insider of the Debtors.  CRS does not have any previous or current connection with any insider of the Debtors or any insider of an insider of the Debtors.

20.     To the best of my knowledge, CRS does not hold or represent any interest materially adverse to the Debtors or to the Debtors' estates.  Also, to the best of my knowledge, CRS has no prior connection with the Debtors, any creditors of the Debtors or their estates, or any other party in interest in the Debtors' cases, or any of their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

21.     In the ordinary course of its business, CRS routinely interacts and is involved with a broad network of capital-market participants, including possibly secured creditors in these cases, in matters unrelated to the Debtors' bankruptcy cases.  Neither the Debtors nor CRS believe that such interactions constitute any actual or potential conflict of interests.  CRS will supplement this disclosure and advise the Court if it becomes aware of any potential or actual conflict.

22.     CRS is not and was not an investment banker for any outstanding security of the Debtors.  CRS has not been within three years before the Petition Date an investment banker for a security of the Debtors, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

23.     Neither CRS nor any member of CRS is, nor was, within two years before the Petition Date, a director, officer or employee of the Debtors or of any investment banker for any security of the Debtors.

24.     To the best of my knowledge, CRS does not hold or represent any interest materially adverse to the Debtors or their estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors, or for any other reason.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 6th day of September, 2012, at Boston, Massachusetts.


_____
Brian L. Davies Jr., CIRA, Declarant

**EXHIBIT 1**

**Capstone Partners**
Investment Banking Advisors

### TRANSACTION ENGAGEMENT AGREEMENT

This Transaction Engagement Agreement (the "Agreement") is made by and between Advanced Molecular Imaging LLC, Industrial Digital Imaging, Inc., Advanced Molecular Imaging, Inc., Gamma Medica-Ideas, Inc. and Gamma Medica-Ideas (USA), Inc., debtors and debtors in possession in jointly-administered Chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the Central District of California – San Fernando Valley Division, whose principal place of business is 19355 Business Center Drive, Suite 8 Northridge, CA 91324 (collectively and together with all of its related subsidiaries, affiliates, successors and assigns, the "Company" or "Debtor"), and CRS Capstone Partners LLC, whose headquarters is located at 176 Federal St., 3rd Floor, Boston, MA 02110 ("CRS").  In consideration of the mutual promises set forth below, the Company and CRS agree as follows:

Section 1: Engagement.  The Company hereby engages CRS, subject to Bankruptcy Court approval, to act as its sole and exclusive investment banking advisor in connection with the sale of all or substantially all of the Company by means of a merger, consolidation, recapitalization, business combination, reorganization, spin-off, exchange offer, tender offer, sale of stock or assets, or other similar transactions (any of the foregoing, a "Transaction").

Section 2: Scope of Services.  CRS's services shall include assisting and advising the Company with: (i) formulating a market strategy for a liquidity transaction; (ii) preparing a memorandum and presentations for use in the transaction process; (iii) identifying and evaluating a refined targeted list of potential strategic and/or financial acquirers ("Prospective Acquirers"); (iv) initiating contact and arranging introductions with Prospective Acquirers; (v) conducting telephonic or in-person meetings; (vi) coordinating the receipt and comparison of any offers or proposals forthcoming from Prospective Acquirers; (vii) assessing and analyzing proposed valuations, transaction structures and related terms and conditions; and (viii) negotiating and consummating definitive agreements, including where appropriate, responding to the Company's reasonable requests for assistance in coordinating the due diligence and transaction closing processes (the "Services").

CRS accepts the above engagement and agrees to devote commercially reasonable time and effort to advise the Company and to assist the Company in consummating a Transaction on terms acceptable to the Company.  The Company understands that by this Agreement, CRS does not guarantee the consummation of a Transaction.  CRS, for all purposes hereunder, shall be an independent contractor.  This Agreement is not intended in any way to create the relationship of principal or agent between the Company and CRS, nor shall this Agreement be deemed to have established a partnership or joint venture.  The Company shall have the sole and absolute right to accept or reject any offer received from Prospective Acquirers, and any Transaction Fee (as defined in Section 3 below) payable hereunder shall be paid by the Company to CRS only if a Transaction is consummated.

The Company acknowledges that CRS has been retained hereunder solely as an advisor to the Company, and not as an advisor to or agent of any other person, and that the engagement of CRS is as an independent contractor and not in any other capacity including as a fiduciary.  Neither this agreement nor CRS's performance hereunder nor any previous or existing relationship between CRS and the Company will be deemed to create any fiduciary relationship. The Company further acknowledges that it is not relying on the advice of CRS for tax, legal or accounting matters, and will rely on the advice of its own professionals and advisors for such matters and will make an independent analysis and decision regarding any Transaction based upon such advice.

Section 3: Professional Fees.  As compensation for Services rendered hereunder by CRS, the Company agrees to pay CRS: a non-refundable retainer of $100,000 payable upon the execution of this Agreement, and, if applicable, a transaction completion fee payable immediately upon closing equal to either (i) $200,000 if the Aggregate Transaction Value (as defined in Section 4 below) is less than $9.0 million, or; (ii) three and one half percent (3.50%) if the Aggregate Transaction Value is between $9.0 million and $13.0 million, or; (iii) five percent (5.00%) if the Aggregate Transaction Value is over $13.0 million. CRS acknowledges from time to time it may be required to testify in Bankruptcy Court related to its retention, Services or professional fees. Such time incurred by CRS related to providing testimony in Bankruptcy Court related to Services, but not to its retention or professional fees (the "Testimony Services"), shall be billed on an hourly basis consistent with CRS's normal billing rates.

During the term of this Agreement, the Transaction Fee, if earned by CRS pursuant to the terms herein, shall be payable to CRS regardless of whether or not the Prospective Acquirer was introduced to the Company by CRS or otherwise. In addition, the Company agrees to reimburse CRS for all reasonable expenses related to the Services and Transaction described herein.

The Company acknowledges that there are no brokers, representatives, or other persons who have an interest in compensation due to CRS from the Services and Transaction contemplated herein. During the term of this Agreement, the Company agrees not to hire or authorize any other person or party to act as investment banking advisor to the Company in connection with the Services and/or related matters covered by this Agreement.

Section 4: Transaction Value. For purposes of this Agreement, transaction value will be determined based on all proceeds received, or to be received, by the Company, the principal shareholders and its holders of equity-linked securities, including without limitation, cash, notes and loans, securities, real and personal property sold or leased, earn-out consideration, non-competition agreements, license and/or royalty arrangements, employment and consulting agreements in excess of fair market compensation, excess working capital, assets and/or equity retained, and the total amount of liabilities assumed, discharged or taken subject to (the "Aggregate Transaction Value").

If any proceeds are to be paid through earnout or royalty (i.e., financial instruments or agreements whose value at closing cannot be determined due to it being based solely on the future performance or earnings), the Company and CRS will negotiate in good faith to agree upon a discounted value for that portion of the Transaction Fee to be paid to CRS in consideration for such contingent consideration. If the Company and CRS cannot agree on such a discounted fee, the portion of the Transaction Fee payable to CRS for the contingent portion of the Aggregate Transaction Value shall be paid on amounts actually received by the Company, the principal shareholders and its holders of equity-linked securities, and shall be payable when received. In the event the Aggregate Transaction Value or a portion thereof is in the form of debt or equity securities, then the amount of the Aggregate Transaction Value shall be based on the fair market value of such securities determined as of the closing date. The fair market value of any debt securities shall be determined based on the par value of the principal balance of such debt securities without consideration given to any future interest payments or equity warrants related to such debt securities. The fair market value of any other securities not traded on any established market or exchange, as well as any other non-cash property included in the Aggregate Transaction Value, shall be mutually determined and agreed to based on either a net present value or fair market value of such securities and/or property.

Section 5: Term and Termination. This Agreement shall be in effect (the "Term") for twelve (12) months from the date of Company's execution of this Agreement, and continue thereafter until terminated by either party upon ten (10) days prior written notice to the other party. The Company and CRS expressly acknowledge and agree that the provisions of Sections 3 through 12, inclusive, shall survive any termination of this Agreement.

Notwithstanding the termination of this Agreement for any reason, the Company will remain obligated to pay to CRS the Transaction Fee if the Company: (i) within 12 months after the date of such termination, enters into an agreement with respect to a Transaction that subsequently is consummated involving a Prospective Acquirer that prior to termination of this Agreement had been: (a) contacted with respect to a Transaction; (b) made aware of a Transaction through the efforts of or material produced by Capstone, either directly or indirectly; or (c) otherwise expressed interest in a Transaction with the Company and/or (ii) terminates a Transaction with a Prospective Acquirer after the Company has entered into a written agreement pertaining to a Transaction. Notwithstanding the foregoing, the Company will not be obligated to pay to CRS a Transaction Fee under (ii) above if the termination by the Company of a Transaction under agreement is pursuant to terms and conditions of such agreement, or is based on any material change, default or amendment to said agreement requested by the Prospective Acquirer, unless the request for any such material change or amendment relates specifically to or arises out of the Company's failure to defend or support the information provided by the Company to the Prospective Acquirer and on which basis the written agreement was entered into by the Prospective Acquirer.



<u>Section 6:  Representations</u>.  The Company represents and warrants that the Company, to the best of its knowledge, is now and shall remain in material compliance with all local, state, and federal laws, rules, and regulations materially affecting the operation of the Company.  The Company further represents and warrants, to the best of its knowledge, that all facts, figures, information and additional supporting documentation pertaining to the Company that have been or will be provided to CRS by the Company are true and accurate in all material respects.  The Company understands that CRS will rely on such facts, figures and other information when describing and promoting a Transaction to potential Prospective Acquirers without making an investigation into the accuracy of such representations by the Company.  As such, the Company will actively participate in the preparation of any descriptive materials related to a Transaction and assume sole responsibility for the content of said materials.

In the event that during the Term of this Agreement, the Company or any of its officers, directors, employees or agents is contacted by or on behalf of any prospective purchaser or other third party concerning the possibility of a Transaction, the Company will promptly so inform CRS and will refer any such persons to CRS.

<u>Section 7:  Indemnification</u>.  The Company, or its survivor, shall: (i) indemnify and hold harmless CRS, its officers, directors, members, managers, employees, affiliates, consultants and agents or assignees (collectively the "<u>CRS Indemnified Persons</u>") from and against any and all losses, claims, damages or liabilities to which any CRS Indemnified Person may become subject arising in any manner out of or in connection with the rendering of services by CRS hereunder unless it is finally determined by a court or arbitral tribunal that such losses, claims, damages or liabilities are solely the result of CRS's gross negligence or willful misconduct; and (ii) reimburse each CRS Indemnified Person promptly for all legal and other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by CRS hereunder.

Likewise, CRS shall: (i) indemnify and hold harmless the Company, its officers, directors, members, managers, employees, affiliates, consultants and agents or assignees (collectively the "<u>Company Indemnified Persons</u>") against any and all losses, claims, damages or liabilities to which any Company Indemnified Person may become subject resulting solely from CRS's gross negligence or willful misconduct as finally determined by a court or arbitral tribunal; and (ii) reimburse each Company Indemnified Person promptly for all legal and other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings resulting solely from CRS's gross negligence or willful misconduct.  The aggregate amount of any such losses, claims, damages, or liabilities against CRS shall be capped at the amount of fees actually received by CRS from the Company hereunder.

The Company and CRS agree that the indemnification and reimbursement commitments set forth in this Section 7 shall apply whether or not CRS, the Company, any CRS Indemnified Person, or any Company Indemnified Person is a formal party to any lawsuit, investigation, claim or other proceeding and whether or not any such CRS Indemnified Person or Company Indemnified Person is at the time affiliated with CRS or the Company, respectively.  The Company and CRS further agree that, without the other party's prior written consent, such consent not to be unreasonably withheld or delayed, they will not enter into any settlement of a lawsuit, claim or other proceeding arising out of the transactions contemplated by this Agreement to which the Company, CRS, any CRS Indemnified Person or any Company Indemnified Person is an actual party or, in the reasonable judgment of the such party, is a potential party, unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all parties seeking or providing indemnification.

If indemnification is to be sought hereunder, then the party seeking indemnification shall notify the indemnifying party of the commencement of any action or proceeding in respect thereof; provided, however, that the failure to so notify the indemnifying party shall not relieve the indemnifying party from any liability that they may have to such party seeking indemnification pursuant to this Section 7 except to the extent the indemnifying party has been prejudiced in any material respect by such failure or from any liability that they may have to the party seeking indemnification other than pursuant to this Section 7.  Notwithstanding the above, following such notification, the



indemnifying party may elect in writing to assume the defense of such action or proceeding, and, upon such election, they shall not be liable for any legal costs subsequently incurred by such party seeking indemnification (other than reasonable costs of investigation and providing evidence) in connection therewith, unless (i) they have failed to provide counsel reasonably satisfactory to such party seeking indemnification in a timely manner, (ii) counsel which has been provided by the indemnifying party reasonably determines that its representation of such party seeking indemnification would present it with a conflict of interest or (iii) the party seeking indemnification reasonably determines that there may be legal defenses available to it which are different from or in addition to those available to the party providing indemnification and such party seeking indemnification reasonably determines that the counsel which has been provided by the party providing indemnification would have a conflict of interest with respect to such legal defenses.  In connection with any one action or proceeding, the party providing indemnification shall not be responsible for the fees and expenses of more than one separate law firm in any one jurisdiction for all parties seeking indemnification.

Section 8: Confidentiality.  Any materials (other than the descriptive materials which CRS will assist the Company in preparing) prepared by CRS and any advice rendered by CRS to the Company are solely for the Company's confidential use and may not be reproduced, summarized, referred to, disclosed publicly or given to any other person or entity other than the Company's legal and accounting advisors.  Any disclosure of or description of the services that CRS performs under this Agreement must be agreed to in advance by CRS.

Any proprietary information provided to CRS by the Company shall be held in confidence and be used only for the purpose proposed herein.  Upon termination of this Agreement, CRS (at the Company's option) hereby agrees to return all proprietary information provided by the Company, except that CRS shall be able to retain copies of any such materials it deems in its sole discretion to be commercially appropriate working papers kept in confidence by CRS for regulatory record keeping purposes.  The confidentiality of said proprietary information shall survive the termination of this Agreement.  Nevertheless, CRS will be free to disclose any proprietary information obtained from the Company to the extent that such disclosure (i) has been consented to by the Company, or (ii) is required by law, regulation, judicial or governmental order, subpoena or other legal process or is requested or required by any governmental authority or regulatory agency including, without limitation, any disclosure that CRS may be required to make pursuant to internal risk control procedures in connection with any related financing that CRS may arrange, so long as CRS uses commercially reasonable efforts to provide the Company prior written notice of such disclosure at least five (5) days prior to such disclosure.

The Company agrees that upon consummation of the Transaction contemplated herein, CRS may, at CRS's expense, advertise and otherwise disclose its role in effecting the Transaction.

Subject to the Company's guidance and approval, the Company authorizes CRS to negotiate on the Company's behalf confidentiality agreements with potential parties to a Transaction and to deliver confidential memoranda or other data furnished to CRS by the Company for distribution to such parties.

Section 9: Forbearance.  Any forbearance by CRS or the Company in exercising any of its rights under this Agreement shall not be considered a waiver of such right(s).  Any waiver must be expressly granted in writing and a waiver on any one occasion shall not be construed as a waiver on any future occasion.

Section 10: Notification.  Any notices pursuant to this Agreement shall be in writing and shall be deemed sufficiently given when sent and on the date of posting, by certified mail, return receipt requested, overnight delivery or similar messenger service, to the respective addresses of the Company and CRS set forth above, or to any other address specified by any party by written notice to the other party.

Section 11: Governance.  This Agreement incorporates the entire understanding between the Company and CRS and supersedes all previous agreements relating to the subject matter hereof.  This Agreement may not be amended or modified except in a writing signed by the Company and CRS.  This Agreement shall be binding upon and inure to the benefit of the Company and CRS and their respective successors and assigns.  If any term or provision of this Agreement shall to any extent be deemed illegal, invalid or unenforceable, the remainder of this Agreement shall not



be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

This Agreement shall be governed by and construed and enforced in accordance with the laws of The Commonwealth of Massachusetts. The Company and CRS hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the United States District Court located in the City of Boston and, in the event such United States District Court does not have jurisdiction over the parties hereto, then to the courts of The Commonwealth of Massachusetts located in Suffolk County for any lawsuits, actions or other proceedings arising out of or relating to this Agreement and agree not to commence any such lawsuit, action or other proceeding except in such courts. The Company and CRS further agree that service of any process, summons, notice or document by mail to their respective addresses set forth above shall be effective service of process for any lawsuit, action or other proceeding brought against either party in any such court. The Company and CRS hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, action or other proceeding arising out of or relating to this Agreement in the courts of The Commonwealth of Massachusetts or the United States District Court located in the City of Boston, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such lawsuit, action or other proceeding brought in any such court has been brought in an inconvenient forum. Any right to trial by jury with respect to any lawsuit, claim or other proceeding arising out of or relating to this Agreement or the services to be rendered by CRS hereunder is expressly and irrevocably waived.

Section 12: Arbitration. Any controversy or claim arising out of or relating to the Transaction Fee shall be settled by binding arbitration, administered by the American Arbitration Association in accordance with its commercial arbitration rules, and determination of the Transaction Fee rendered by the arbitrator may be entered in any court having jurisdiction thereof. Each party shall bear its own costs and expenses of arbitration, and shall share equally the costs of the arbitrator and the administrative fees and costs of arbitration. The arbitration award shall be made within nine months of the notice of intent to arbitrate given by either party, and the arbitrator shall agree to comply with this schedule before accepting appointment.

This Agreement has been and is made solely for the benefit of the Company, CRS and their respective successors and assignees, and no other person shall acquire or have any right under or by virtue of this Agreement. By signing below, both parties hereby understand and agree to the full terms, conditions and provisions of this Agreement and further represent and warrant that the undersigned constitute all, or the authorized representative of all, of the owners, partners and shareholders of the Company and CRS, respectively, and that they are duly authorized to enter into this Agreement which shall be binding and enforceable in accordance with its terms.

Advanced Molecular Imaging LLC,
Industrial Digital Imaging, Inc.,
Advanced Molecular Imaging, Inc.,
Gamma Medica-Ideas, Inc., and
Gamma Medica-Ideas (USA), Inc.

By _____          Date _____

    James Calandra
     President & Chief Executive Officer

**CRS CAPSTONE PARTNERS LLC**

By _Brian L Davies_____          Date      September 6, 2012
    _____               _____
    Brian L. Davies Jr.
    Managing Director

**EXHIBIT 2**



**Exhibit 2**
**CRS Capstone Partners Hourly Billing Rates**

| Title | Hourly Rate |
|---|---|
| Managing Director | $500 |
| Principal, Director | $375 |
| Vice President | $300 |
| Associate | $200 |
| Analyst | $100 |

| In re:                                      | CHAPTER  11                    |
|---------------------------------------------|--------------------------------|
| **GAMMA MEDICA-IDEAS (USA), INC.,** *et al.* |                               |
|                                   Debtors.  | CASE NO.  1:12-bk-17469-VK     |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described as: **NOTICE OF HEARING ON APPLICATION AND APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO EMPLOY CRS CAPSTONE PARTNERS LLC AS INVESTMENT BANKER PURSUANT TO 11 U.S.C. § 328; DECLARATION OF BRIAN L. DAVIES JR., CIRA IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **September 6, 2012**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender    rb@lnbyb.com
- David J Cook    Cook@SqueezeBloodFromTurnip.com
- Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
- Marshall F Goldberg    mgoldberg@glassgoldberg.com
- Gregory A Martin    gmartin@winston.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Justin E Rawlins    jrawlins@winston.com, docketla@winston.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL:**  On **September 6, 2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

*[X] Service list served by U.S. Mail*

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 6, 2012**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
Hon. Victoria Kaufman
United States Bankruptcy Court
21041 Burbank Blvd., Ctrm 301
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 6, 2012 | Stephanie Reichert | */s/ Stephanie Reichert* |
|-------------------|--------------------|--------------------------|
| *Date*            | *Type Name*        | *Signature*              |

**Top 20, Secured, OUST, RSN
Consolidated Service Lists for:**
*Gamma Medica-Ideas (USA), Inc.
Gamma Medica-Ideas, Inc.
Advanced Molecular Imaging LLC
Advanced Molecular Imaging, Inc.
Industrial Digital Imaging, Inc.*

Barbara J. Ossias
Reimbursement Revenue Solutions
3223 Old National Pike
Middletown, MD 21769

Blue Star Infotech America
2350 Mission College Blvd.
Santa Clara, CA 95054

Christie, Parker & Hale LLP
PO Box 29001
Glendale, CA 91209-9001

DeviceLab, Inc.
3002 Dow Avenue, Suite 124
Tustin, CA 92780

Endicott Interconnect Technologies
Accounts Receivable Dept 258-3
1093 Clark Street
Endicott, NY 13760

Equipment Veterinaire Minerve
Z.I. - Rue de l'Aube
Esternay,  51310

Experien Group
11240 Magdalena Road
Los Altos Hills, CA 94024

GE Healthcare  (vendor)
PO Box 843553
Dallas, TX 75284-3553

GE Healthcare Canada
2300 Meadowvale Blvd
Mississauga, ON L5N 5P9

Hamamatsu Corporation
PO Box 6910
360 Foothill Road
Bridgewater, NJ 08807-0910

Texas State Comptroller
Comptroller of Public Accounts
PO Box 149359
Austin, TX 78714-9359

Johns Hopkins University (Research)
c/o Bank of America
12529 Collections Center Drive
Chicago, IL 60693

McGladrey & Pullen, LLP
331 West 3rd Street, #200
Davenport, IA 52801

SII NanoTechnology USA Inc.
19865 Nordhoff Street
Northridge, CA 91324

Singer Lewak
10960 Wilshire Blvd. 7th Floor
Los Angeles, CA 90024

Stubbs Alderton & Markiles, LLP
15260 Ventura Blvd., 20th Floor
Encino, CA 91403

Compass Network
9455 Ridgehaven Court
Suite 100
San Diego, CA 92123-4381

MAC Incorporated
31461 Rancho Viejo Road
Suite 201
San Juan Capistrano, CA 92675

TLD Legal
Avocats au Barreau de Paris
Toque: K0092
Paris 75116

UT MD Anderson CC
PO Box 297402
Houston, TX 77927

Christie Parker Hale LLP
655 N Central Ave
# 2300
Glendale, CA 91203

Delaware Secretary of State
Division of Corporations
PO Box 5509
Binghamton, NY 13902-5509

Choate Hall & Steward LLP
2 International Place
Boston, MA 02110

New Season Corporate Services
4600 Larson Way
Sacramento, CA 95822

Houlihan Lokey Capital, Inc.
Accounts Receivable Dept.
10250 Constellation Blvd, 5th Flr.
Los Angeles, CA 90067-6802

National Registered Agents, Inc.
PO Box 12432
Newark, NJ 07101-3532

Stubbs Alderton & Markiles, LLP
15260 Ventura Blvd, 20th Floor
Sherman Oaks, CA 91403

RSM McGladrey, Inc
18401 Von Karman Avenue, 5th Floor
Irvine, CA 92612-8531

Singer Lewak
10960 Wilshire Blvd, # 700
Los Angeles, CA 90024

Capital Resource Partners
31 State Street
6th Floor
Boston, MA 02109

Capital Resource Partners V, L.P.
31 State Street
6th Floor
Boston, MA 02109

Bradley Patt
5416 Katherine Avenue
Sherman Oaks, CA 91401


Steven J. Lee
31 State Street
6th Floor
Boston, MA 02109

Technical Imaging Solutions (TIS)
745 Stark Lane
Sherman, TX 75090

Psilos Group Managers LLC
21 Tamal Vista Blvd.
Suite 194
Corte Madera, CA 94925


CIT Technology Financing Services, Inc.
10201 Centurion Parkway North, Suite 100
Jacksonville, FL 32256

Textron Financial Corporation
4949 SW Meadows Rd., Suite 500
Lake Oswego, OR 97035

De Lage Landen Financial Services, Inc.
1111 Old Eagle School Road
Wayne, PA 19087


Miller, Joseph M
24917 Normans Way
Calabasas, CA 91302

Patt, Bradley E
5416 Katherine Avenue
Sherman Oaks, CA 91401

Iwanczyk, Jan S.
3066 Carda Drive
Los Angeles, CA 90049


Bridge Bank, National Association
55 Almaden Boulevard
San Jose, CA 95113

Capital Resource Partners V, L.P.
200 State Street
Boston, MA 02109

Sii Nanotechnology USA Inc.
Attn: Masanori Takahashi
19865 Nordhoff Street
Northridge, CA 91324


Board Of Equalization
Po Box 942879
Sacramento, CA 94279

Miller, Joseph M
24917 Normans Way
Calabasas, CA 91302

Technical Imaging Solutions, LLC
14716 E Twinlake Dr.
Wichita, KS 67230


Stanford Photonics, Inc.
Attn: Cook Collection Attorneys, PLC
David J. Cook, Esq.
165 Fell Street
San Francisco, CA 94102-5106

Iwanczyk, Jan S.
3066 Carda Drive
Los Angeles, CA 90049

Technical Imaging Solutions, Inc.
Attn:Klein, DeNatale, Goldner, et al.
T. Scott Belden, Esq.
4550 California Ave, 2nd Floor
Bakersfield, CA 93309

Aerotek, Inc.
Attn:  Bruce A. Hatkoff, Esq.
18757 Burbank Blvd, Suite 100
Tarzana, CA 91356

Brian I. Swett, Esq.
Justin Rawlins, Esq.
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Fedex Techconnect, Inc.
Attn: Sakaida & Bui
Long K. Bui, Esq.
2355 Westwood Blvd, Suite 327
Los Angeles, CA 90067

Karim Merchant, Esq.
Baker & McKenzie LLP
300 East Randolph Street, Suite 5000
Chicago, Illinois  60601

U.S. Trustee - San Fernando Valley
21051 Warner Center Lane
Suite 115
Woodland Hills, CA 91367

Michael J. Goldberg, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210

Melissa Ausland
McGladrey LLP
801 Nicollet Avenue, Ste. 1100
Minneapolis, MN  55402

Stanford Photonics, Inc.
c/o Cook Collection Attorneys, PLC
David J. Cook, Esq.
P.O. Box 270
San Francisco, CA 94104-0270

Stanford Photonics, Inc.
Attn: Michael Buchin
1032 Elwell Courtm Suite 104
Palo Alto, CA 94303

Europlay Capital Advisors, LLC.
Attn: Joseph Miller
15260 Ventura Blvd, 20th Floor
Sherman Oaks, CA 91403

The Law Offices of Shai Oved
7445 Topanga Cyn Blvd, Suite 220
Canoga Park, California 91303